378 A.2d 835

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Thomas Carl JONES a/k/a Thomas Carl Friday.**

Supreme Court of Pennsylvania.

Argued Jan. 20, 1977.

Decided Oct. 7, 1977.

William T. Nicholas, Dist. Atty., Stewart J. Greenleaf, Marc Robert Steinberg, Asst. Dist. Attys., Eric J. Cox, Norristown, for appellant.

William B. Eagan, Willow Grove, for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

EAGEN, Chief Justice.

Thomas Carl Jones was charged with murder and numerous related offenses in Montgomery County. He filed motions to suppress evidence of certain statements given by him to police and certain physical evidence seized by the police. Following a hearing on these motions, the Court of Common Pleas by order dated November 6, 1975 suppressed evidence of a .38 caliber gun taken by the police from Jones' possession and evidence of statements made by Jones to the police on April 6, 1975. The Commonwealth filed this appeal from that order. We now affirm.

The relevant facts as established at the suppression hearing are as follows:

On April 3, 1975, at approximately 1:11 p. m., the Norristown police, in response to a phone call, went to 1002 Sterigere Street, Norristown, where the dead body of Eleanor Friday reportedly had been discovered by Jones, her nephew. She had apparently been beaten with a blunt instrument. The police interviewed Jones on April 3rd.

On April 4, 1975, when the police sought Jones at his residence for further questioning, they discovered he had fled the area. The police also learned various facts which resulted in the issuance of a warrant for Jones' arrest for theft of movable property, 18 Pa.C.S.A. § 3125, namely, a .38 caliber revolver. Notice that an arrest warrant was outstanding against Jones was transmitted to the National Crime Information Center [NCIC].

On April 6, 1975, shortly after 7:00 a. m., Corporal Herbert Hoffman of the Missouri State Highway Patrol saw Jones apparently[1] hitchhiking west on Interstate Highway 44 in Rolla, Missouri. Hoffman proceeded to the police station without encountering Jones. At about 8:30 a. m. on the

---

1. We say apparently because Hoffman testified during direct examination that Jones "seemed to be hitchhiking," and during cross-examination that he was "walking" up "a ramp" to the west bound lane of the Interstate Highway.

same day, Hoffman again observed Jones; but, in this instance, Jones was walking south about three miles from where he was first observed, on United States Route Number 63 which intersects Interstate 44. During both observations, Jones was without luggage. Hoffman, in uniform, stopped his vehicle, a marked police car, and asked Jones for identification. Jones handed Hoffman an identification card and Hoffman then "asked [Jones] to have a seat in the patrol car." Hoffman radioed to have a check on Jones run through the NCIC. While the check was being made, Hoffman and Jones engaged in "general conversation." Hoffman testified that Jones was free to leave before the results of the NCIC check were obtained. From the check, Hoffman learned of the outstanding arrest warrant.

Hoffman then asked Jones to step out of the car and Jones complied. As Jones did so, he held his hand up and informed Hoffman he had a weapon. Hoffman then searched Jones and obtained a .38 caliber gun. Hoffman advised Jones he was under arrest for carrying a concealed weapon and also advised him of his constitutional rights. Hoffman then transported Jones to a police station.

At 1:30 p. m. the same day, Hoffman, after having a conversation with a detective in Pennsylvania, spoke with Jones. During this conversation, Jones made various statements[2] relating his activities on April 2nd and 3rd.

Hoffman testified that he approached Jones because his curiosity was aroused by Jones' general appearance, unshaven and unkempt, by his change of direction, by his not having luggage, and because he was not a local resident and had changed his route of travel from an Interstate Highway to a route which was not a "main artery." Additionally, Hoffman testified Jones was not violating any law when observed.[3] Finally, Hoffman testified it was common practice to stop pedestrians on highways in Missouri to learn

2. The statements were exculpatory.

3. The Commonwealth has not brought to our attention any law prohibiting the activity in which Jones was engaged when confronted by Hoffman.

their identity and destination and to run computer checks on them.

The Court of Common Pleas ordered the gun and evidence of the statements made to Hoffman suppressed reasoning that the initial detention of Jones was illegal and that the gun and the statements of April 6th were the products of that illegal detention.

The Commonwealth urges the suppression court erred and contends: 1) the initial confrontation of Jones by Hoffman was not a seizure within the purview of the fourth amendment; and/or, 2) the confrontation, if within the purview of the fourth amendment, was justified under the circumstances as a limited investigatory stop.

As to its first contention, the Commonwealth argues that Hoffman merely approached Jones and questioned him, and that

> "[t]here is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets."

*Terry v. Ohio*, 392 U.S. 1, 34, 88 S.Ct. 1868, 1886, 20 L.Ed.2d 889 (1968) (White, J., concurring) [Hereinafter: *Terry*].

> The Supreme Court of the United States has said: "not all personal intercourse between policemen and citizens involves 'seizures' of persons."

*Terry*, supra at 19, n. 16, 88 S.Ct. at 1879, n. 16. Similarly, we have said that:

> "A policeman may legally stop a person and question him. But he may not without a warrant restrain that person from walking away . . ., unless he has 'probable cause' to arrest that person or he observes such unusual and suspicious conduct on the part of the person who is stopped . . . that the policeman may reasonably conclude that criminal activity may be afoot . . . .."
> [Footnote omitted.]

*Commonwealth v. Berrios*, 437 Pa. 338, 340, 263 A.2d 342, 343 (1970).

 The line of distinction between merely "approaching a person and addressing questions to him" or "legally stopping" him, *Commonwealth v. Berrios, supra,* 437 Pa. at 340, 263 A.2d at 343, [Hereinafter: contact], and restraining him or making a "forcible stop," *Terry, supra,* 392 U.S. at 32, 88 S.Ct. at 1885 (Harlan, J., concurring) [Hereinafter: stop], is not subject to precise definition [4] because of "the myriad daily situations in which policemen and citizens confront each other on the street." *Terry, supra* at 12, 88 S.Ct. at 1875. Each factual situation must be examined to determine if force was used to restrain the citizen in some way. Such force may include "physical force or [a] show of authority." *Terry, supra* at 19, n. 16, 88 S.Ct. at 1879, n. 16.

 If a citizen approached by a police officer is ordered to stop or is physically restrained, obviously a "stop" occurs. Equally obvious is a situation where a police officer approaches a citizen and addresses questions to him, the citizen attempts to leave, and the officer orders him to remain or physically restrains him; here too a "stop" occurs. A more difficult situation arises where no order or physical restraint is involved and the citizen does not attempt to walk away. This situation is more difficult because a police officer in uniform must be considered as showing authority and thus exercising some force simply because he is in uniform, a symbol of authority, when he approaches a citizen and addresses questions to him.

4. The various types of confrontations which can occur between persons and police officers have been categorized as "contacts," "stops" or "temporary detentions of persons for investigation," and "arrests" by the Project on Law Enforcement Policy and Rulemaking in the *Model Rules for Law Enforcement: Stop and Frisk,* College of Law, Arizona State University and Police Foundation (1974). All "contacts" are not "seizures" within the purview of the fourth amendment. However, a "stop" or "temporary detention for investigation" to be legal must meet the standard enunciated in *Terry, supra,* namely, that the officer must observe "unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot . . . ." *Terry, supra* at 30, 88 S.Ct. at 1884. See also *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), wherein the Supreme Court of the United States ruled a "stop" may also be justified by an informant's tip where the tip carries sufficient indicia of reliability.

■ But this is not to say that the force inherent in a uniform is sufficient in itself to warrant a conclusion that a restraint on liberty or a "stop" occurs when the citizen is approached and questioned. Indeed, *Terry*, supra, clearly indicates a uniform, as a symbol of authority, is not in itself a sufficient exercise of force to conclude a "stop" occurs when a citizen is approached and questioned.[5]

■ Since an officer in uniform approaching a citizen and questioning him involves an exercise of force, i.e., a show of some authority, and since that force is insufficient to conclude a "stop" occurs,[6] it follows that whether a "stop" occurs is not dependent on the presence or absence of any force; rather, it is dependent on the amount of force exercised.

■ Thus, to determine when a "stop" has occurred in the more difficult situation all of the circumstances which may in any way evidence a show of authority or exercise of force including such subtle factors as the demeanor of the police officer, the location of the confrontation, the manner of expression used by the officer in addressing the citizen, and the content of the interrogatories or statements must be examined. Once this factual examination has been made, the pivotal inquiry is whether, considering all of the facts

5. In *Terry*, supra, the officer, in plain clothes, approached Terry, identified himself as an officer, and asked Terry for his name prior to searching him. An officer's identification of himself as a police officer conveys the same message to a citizen verbally that a uniform conveys visually, i.e., they are functional equivalents. Yet, the Supreme Court did not consider this message or exercise of force through a "show of force" sufficient for it to conclude a "seizure" took place prior to the officer searching Terry. *Terry*, supra at 19, n. 16, 88 S.Ct. at 1879, n. 16.

6. See A.L.I., *A Model Code of Pre-arraignment Procedure*, Proposed Official Draft, § 110.1 (1975), wherein a request by a police officer for cooperation or information from a citizen, as opposed to a suspect, which results in compliance is not regarded as involuntary or coerced compliance absent additional circumstances. Compare *Schneckloth v. Bustamonte*, 412 U.S. 218, 247, 93 S.Ct. 2041, 2058, 36 L.Ed.2d 854 (1973), wherein the Supreme Court, albeit in the context of a consent search, stated: "[t]here is no reason to believe . . . that the response to a policeman's question is presumptively coerced."

and circumstances evidencing an exercise of force, "a reasonable man, innocent of any crime, would have thought [he was being restrained] had he been in the defendant's shoes." *United States v. McKethan*, 247 F.Supp. 324, 328 (D.D.C. 1965), aff'd by order No. 20,059 (D.C.Cir.1966).[7]

▮ Instantly, we believe the totality of the circumstances would have led a reasonable man to conclude he was being restrained or stopped for investigatory purposes by Hoffman's initial exercise of force when confronting Jones. While the situation presents a close question, an examination of the entire situation shows not only an exercise of force but also an escalation in that exercise. Hoffman

**7.** We adopt this wholly objective standard for determining what amount of force will result in a conclusion that a "stop" occurs for numerous reasons:

1) a wholly subjective test would require police investigating crime to modify their behavior towards each and every person they approach and thereby result in the police being unable to predict what type of behavior on their part will result in a seizure, cf. *Hicks v. United States*, 127 U.S.App.D.C. 209, 382 F.2d 158 (1967); and,

2) a subjective-objective test, which would require the accused to subjectively conclude he was being restrained and to conclude so reasonably, would not serve the deterrent purpose of the exclusionary rule because a policeman might escalate his exercise of force when confronting persons he believes are not easily restrained by authority.

The wholly objective test has apparently been adopted by the United States Court of Appeals for the District of Columbia since it has been quoted with approval. See *Hicks v. United States*, supra; *Coates v. United States*, 134 U.S.App.D.C. 97, 413 F.2d 371 (1969); *Frazier v. United States*, 136 U.S.App.D.C. 180, 419 F.2d 1161 (1969); *Fuller v. United States*, 132 U.S.App.D.C. 264, 407 F.2d 1199 (1968), cert. denied, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125. In *Fuller*, supra, the court declined to express a view on whether the test would be modified if it were shown the officer was or should have been aware of a condition of the citizen which would lessen his capacity to act as a reasonable man. Likewise, we need not now express any view on such a possible modification of the test.

We also note that, while not required to do so, an officer who wishes to approach a citizen to investigate crime but who does not wish to "stop" that citizen, can best predict the consequences of his behavior by advising the citizen he is free to leave without answering questions. Cf. LaFave, *'Street Encounters' and the Constitution*: *Terry, Sibron, Peters and Beyond*, 67 Mich.L.R. 39 (1968); Bogomolny, *Street Patrol: The Decision to Stop a Citizen*, 12 Crim.L.B. 544 (1976).

approached Jones on a highway in a marked car and in uniform and addressed questions to him. In doing so, he did not merely ask Jones his name; rather, he immediately sought identification from Jones, and, when Jones complied he escalated the exercise of force by asking Jones to be seated in the car. This latter request was not merely an attempt to obtain information; rather, while stated as a question, it sought control of Jones' movement.[8] Thus, we believe the Court of Common Pleas was correct in ruling the initial confrontation of Jones by Hoffman constituted a seizure within the purview of the fourth amendment, specifically a "stop for investigatory purposes."

As to the Commonwealth's second contention, that the initial seizure was justified as a limited investigatory stop, little discussion is required. A stop for investigatory purposes in this context is justified only if the "police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot . . .." *Terry*, supra 392 U.S. at 30, 88 S.Ct. at 1884. Hoffman testified his observations aroused his curiosity and suspicion about Jones; but, he also testified Jones was violating no law when observed and the record is devoid of any facts to support a reasonable conclusion that criminal activity may have been afoot. Thus, under the circumstances presented, the seizure lacked justification.

The order of the Court of Common Pleas is affirmed.

JONES, former C. J., did not participate in the consideration or decision of this case.

---

**8.** We note that Hoffman's questions did not focus on a general investigation of crime; rather, they focused on Jones. Considering the nature of the questions and their focus on Jones, we believe a reasonable man would conclude Hoffman was displaying authority in order to restrain him. Compare *Commonwealth v. Fisher*, 466 Pa. 216, 352 A.2d 26 (1976), wherein we reiterated the requirement that *Miranda* warnings be given in a situation where a person reasonably believes his freedom of movement is restricted by interrogation which focuses on him.