**Commonwealth v. Leach**

C.P. of Dauphin County, no. 2768 C.D. 1995.

*Douglas K. Marsico,* for the Commonwealth.
*Paul L. Muller,* for defendant.

CLARK, *J.,* April 4, 1996—This court has been called upon to review defendant's motion to suppress evidence seized from his person by the Harrisburg police. After a hearing on the matter and an independent examination

of the record and existing law, in accordance with the attached order, the motion is hereby granted.

In spite of the foregoing decision, this court recognizes the inherent evils possessed by narcotics possession, distribution and use. The members of the Harrisburg police, Community Attack on Narcotics unit are strongly commended for ferreting out such undesirable activity and improving the lifestyle of city residents. However, the officers must be careful that their overzealousness does not encroach upon the rights guaranteed by the Fourth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution. The Fourth Amendment provides citizens the right to be secure in "their persons, houses, papers, and effects, against unreasonable searches and seizures." The Pennsylvania Constitution further ensures that "people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures." Pa.C.S. Constitution Article 1, section 8.

In order to assure that these constitutional rights are preserved, the methods utilized by the police in fighting the war on drugs must be examined with strict scrutiny. It is imperative that the end shall not be used to justify the means.

"The seriousness of the criminal activity under investigation, whether it is the sale of drugs or the commission of a violent crime, can never be used as justification for ignoring or abandoning the constitutional right of every individual in this Commonwealth to be free from intrusions upon his or her personal liberty absent [reasonable suspicion or] probable cause." *Commonwealth v. Rodriquez,* 532 Pa. 62, 73, 614 A.2d 1378, 1383 (1992).

In the case at hand, the police used the offense of drug possession as justification for abandoning the de-

fendant's constitutional right to be free from unreasonable searches and seizures.

On July 25, 1995, at approximately 9:30 p.m., Harrisburg Police Officers Christopher Juba and Donald Heffner were on a routine patrol in the 1900 block of Susquehanna Street in the City of Harrisburg. Officer Juba testified that he was traveling in an unmarked vehicle in a northerly direction along the 1900 block when he first observed the defendant. (N.T. 9, ll. 19.) The defendant was standing in a well-lit area on the 2000 block while straddling a bicycle between his legs. (N.T. 5, ll. 18-24; 17 ll. 6-7.) Officer Juba stated he was approximately 50 to 60 yards away from the defendant when he noticed him engaging in a conversation with a gentleman standing to his left. (N.T. 16, ll. 25-17, ll.1, 5, ll. 18-6, ll. 1-2)). Officer Juba explained that he had a partial front and side view of the defendant and a back view of the other gentleman. (N.T. 11, ll. 8-16.) As the vehicle slowly approached the men, Officer Juba witnessed the defendant receive U.S. currency from the other gentleman. The officer was approximately 10 feet away when he saw the defendant take stretched out bills in his right hand. (N.T. 6, ll. 2-5; 17, ll. 16-19.) He also noticed a bulge in the defendant's left front pants pocket which he believed to be a pill bottle. (N.T. 6, ll. 6-9.)

Believing that a possible drug transaction had just occurred, the officers stopped their vehicle as they immediately traveled past the men to conduct a further investigation. (N.T. 6, ll. 11-13.) After the officers exited the vehicle, they identified themselves as members of the Harrisburg police. As they approached the defendant, he simultaneously moved towards their location. At this time, Officer Juba requested identification while Officer Heffner "patted down" the defendant's left front pants

pocket and inquired, "What's that?" (N.T. 7, ll. 4-12; 25, ll. 15-25.) In response thereto, the defendant reached into his pocket and stated, "I will show you." While pulling out a tan pill bottle, the defendant struck Officer Heffner's mouth with his free hand and subsequently threw the bottle onto a nearby garage roof. (N.T. 7, ll. 16-21; 26, ll. 3-14.)

After a brief struggle, the defendant was placed under arrest and charged with the following: possession with intent to deliver a controlled substance, resisting arrest, unlawful possession of drug paraphernalia, and unlawful possession of a small amount of marijuana. A search incident to the arrest produced a bag of marijuana and $24 in cash. These items, along with the pill bottle which was found to contain crack cocaine, were taken into evidence. On December 8, 1995, the defendant filed a motion to suppress the seized evidence. A hearing was held on the matter before the present court on February 7, 1996.

In deciding whether to grant the defendant's motion, the circumstances surrounding his arrest must be analyzed in a series of four steps. We must determine whether (1) the defendant was detained or seized by police; (2) the detention was lawful; (3) the defendant was frisked by police; and (4) the frisk was lawful. If all of these steps cannot be satisfied, then the evidence must be suppressed on the basis that it was illegally obtained. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The Pennsylvania Supreme Court recently addressed the issue of whether, in fact, a person has been seized within the meaning of Article 1, Section 8 of the Pennsylvania Constitution. In *Commonwealth v. Matos;*

*Commonwealth v. McFadden,* and *Commonwealth v. Carroll,* 543 Pa. 449, 672 A.2d 769 (1996), the court consolidated three cases, whereby it rejected the standard set forth by the U.S. Supreme Court in *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.E.2d 690 (1991). Under *Hodari D.,* an arrest or seizure of a person under the Fourth Amendment requires either the application of physical force with lawful authority or submission to the assertion of authority. In discarding this test, the Pennsylvania Supreme Court adopted the standard it set forth in *Commonwealth v. Jones,* 474 Pa. 364, 378 A.2d 835 (1977) in conjunction with the standard of the United States Supreme Court in *United States v. Mendenhall,* 466 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). In *Jones* the court adopted an objective standard to determine what amount of force is necessary to constitute the initiation of a *Terry* stop. The standard is whether "a reasonable [person] innocent of any crime, would have thought (he was being restrained) had he been in the defendant's shoes." *Id.* at 373, 378 A.2d at 840. In *Mendenhall* the U.S. Supreme Court decided, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *Id.,* 466 U.S. at 555, 100 S.Ct. at 1877, 64 L.Ed.2d at 509.

In *Matos, supra,* the Pennsylvania Supreme Court revisited its decision in *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991) and continued to interpret the Pennsylvania Constitution as providing a well established right of privacy for its citizens. In its analysis, the court refused to be "bound by the

decisions of the United States Supreme Court which interpret similar (yet distinct) federal constitutional provisions." *Id.* at 454, 672 A.2d at 772, quoting *Edmunds, supra* at 388, 586 A.2d at 894. It reviewed the historical context and application of Article 1, Section 8 and concluded it provides "different and broader protections than [the Fourth Amendment]." *Id.* at 455, 672 A.2d at 772. History indicates that Article 1, Section 8 originated from the original U.S. Constitution of 1776, prior to the adoption of the Fourth Amendment. From the date of its inception, over 200 years, the language of Article 1, Section 8 has remained unchanged, signifying Pennsylvania's paramount concern for the privacy of its citizens. *Id.* at 455-56, 672 A.2d at 773. Thus, "the purpose of the exclusionary rule as developed in Pennsylvania was not solely to deter police conduct, as the United States Supreme Court interpreted it, but rather was *"unshakably linked to a right of privacy in this Commonwealth."* *Id.* at 456, 672 A.2d at 773, quoting *Edmunds, supra* at 397, 586 A.2d at 898. (emphasis added)

In preserving this right to privacy, the Pennsylvania courts have consistently applied the *Jones/Mendenhall* standard to determine whether the conduct of police amounts to a seizure or a mere encounter between citizen and police. "When an officer, by means of physical force or show of authority, has restrained the liberty of an individual, a 'seizure' has occurred." *Commonwealth v. Lewis,* 535 Pa. 501, 508, 636 A.2d 619, 623 (1994). See also, *Jones, supra.* The force or show of authority utilized to restrain the citizen must be examined to decide if the citizen believed he was free to leave. The situation becomes difficult when the police do not order or physically restrain the citizen and the

citizen does not attempt to walk away. If this is the case, all of the circumstances surrounding the encounter must be examined for a show of authority. *Id.* at 372, 378 A.2d at 839. The court shall consider the demeanor of the police officer, the location of the confrontation, the manner of expression used by the officer in addressing the citizen, and the content of the interrogatories or statements. The fact that an officer is in plain clothes does not diminish his show of authority. "An officer's identification of himself as a police officer conveys the same message to a citizen verbally that a uniform conveys visually, *i.e.,* they are functional equivalents." *Id.* at 372 n.5, 378 A.2d at 839 n.5.

The facts at hand indicate that Officers Juba and Heffner were traveling in an unmarked vehicle. (N.T. 5, ll. 10-12.) When they were approximately five feet away from the defendant, the officers alighted from their vehicle and began to approach the defendant. (N.T. 20, ll. 21-22; 31, ll. 18-21.) Simultaneously, the defendant came toward the location of the officers. Officer Juba identified himself and his partner as Harrisburg police and requested identification from the defendant. (N.T. 7, ll. 4-12.) At this time, Officer Heffner approached the defendant, who was still on his bike, and patted the defendant's front left pants pocket. (N.T. 13, ll. 2-7.) While the officer was patting down the defendant's pocket, he was located to the left of the defendant and his partner was either directly in front of the defendant or to his right. Both were positioned fairly close to the defendant. (N.T. 38, ll. 4-15.) In fact, Officer Heffner testified that he was "right on top of [the defendant]." (N.T. 38, ll. 2-4.)

As the officer made physical contact with the defendant's pocket, he attempted to solicit the identity of the contents from him. The officer was clearly aware

he could not arbitrarily go into the defendant's pocket himself and verify what was contained therein. (N.T. 38, ll. 22-25.) In response to questions directed by the court, Officer Heffner gave the following reply:

"THE COURT: So am I to understand then that your actions also were designed to persuade or somehow encourage the defendant to show you what he had in his pocket?

"OFFICER HEFFNER: That is correct." (N.T. 39, ll. 4-7.)

Applying the standard of *Jones/Mendenhall* to the instant case, this court can only conclude that the defendant thought he was being seized by police. Under the circumstances indicated above, a reasonable person would have believed he was being restrained and was not free to leave. The officers stopped their vehicle in close proximity to the defendant. They exited at approximately the same time, identified themselves as police and began to approach him. Recognizing their authority, the defendant traveled towards them. As the parties met, the police positioned themselves in a way that restricted the defendant's movements while one of the officers physically touched his person and questioned him. The defendant responded to the situation by pulling out the bottle, striking the questioning officer and tossing the evidence onto a roof. If the defendant felt he was truly free to leave, he would not have gone to such great lengths to hide the evidence. By striking the police, he placed himself in further jeopardy of receiving additional criminal charges. A man who felt he could easily walk or ride away would have done so. Also, if he thought he did not have to disclose the item, he would have declined to respond to the request. Interestingly enough, during his testimony, Officer Heffner referred to the defendant's detainment as

a *"Terry* stop" and not a mere encounter. (N.T. 36, ll. 12-17.) Accordingly, the defendant was effectively seized and entitled to the protections afforded by both the U.S. Constitution and more importantly, the Pennsylvania Constitution.

Next, we must determine whether the defendant was lawfully detained by police. Pursuant to the Fourth Amendment of the U.S. Constitution and Article 1, Section 8 of the Pennsylvania Constitution, a stop must be reasonable to be considered lawful. A reasonable stop exists when police can "point to specific and articulable facts which, in conjunction with the natural inferences deriving therefrom, reasonably warrant the intrusion." *Commonwealth v. White,* 358 Pa. Super. 120, 128, 516 A.2d 1211, 1215 (1986). See also, *Lewis, supra; In Interest of Barry W.,* 423 Pa. Super. 549, 621 A.2d 669 (1993), *allocatur granted,* 536 Pa. 646, 639 A.2d 32 (1993). This standard is met "if the police officer observes unusual and suspicious conduct on the part of the individual seized which leads him reasonably to conclude that criminal activity may be afoot . . . ." (emphasis in original) *Commonwealth v. Hicks,* 434 Pa. 153, 158, 253 A.2d 276, 279 (1969). See also, *Commonwealth v. Espada,* 364 Pa. Super. 604, 528 A.2d 968 (1987). "Such a conclusion may not be based upon an unparticularized suspicion or 'hunch.' " *Id.* at 607, 528 A.2d at 969, quoting *Terry, supra,* 392 U.S. at 27, 88 S.Ct. at 1883. See also, *Commonwealth v. Greber,* 478 Pa. 63, 385 A.2d 1313 (1978); *Commonwealth v. Jones, supra; Commonwealth v. Martinez,* 403 Pa. Super. 125, 588 A.2d 513 (1991), *allocatur denied,* 530 Pa. 653, 608 A.2d 29 (1991).

In the instant case, the police, notably Officer Juba, observed the defendant engaged in a conversation with another gentleman at 9:30 p.m. on a Tuesday evening.

Without exchanging anything with the other gentleman, the defendant received an undetermined amount of money from him. Officer Juba was unable to ascertain the amount of money given and could only say with certainty that it was stretched out in bills, as opposed to bundled up. (N.T. 10, ll. 17-23.) Immediately after the officer saw the defendant take the money, he noticed a bulge in the defendant's pants pocket which he "believed" to be a pill bottle. (N.T. 6, ll. 6-9.) At no time did the defendant expose this object to confirm the officer's belief. The officer was merely operating on a "hunch" that a drug transaction had taken place when he decided to further investigate the situation.

Pursuant to the aforementioned standard set forth by the Pennsylvania Supreme Court in Hicks, the stop initiated by police was unreasonable and therefore, unlawful. The defendant's conduct could not have reasonably led the police to conclude that criminal activity may have been afoot. Had the defendant exposed the pill bottle, the result may have been different. In this case, the officers were operating on a hunch that the gentleman was giving the defendant money for narcotics which were "believed" to be contained in a pill bottle which was "believed" to be the bulge in the defendant's pocket. Officer Juba was not certain as to what was in the defendant's pocket. He assumed that it was a pill bottle based on its shape and that narcotics were contained therein.

It is difficult to classify the defendant's conduct, on its face, as unusual and suspicious. The incident occurred in the mid evening hours on a weekday. It was summertime and the defendant was riding his bike. He was stopped to converse with another gentleman. One can equally assume that the two were friends and the gentleman was indebted to the defendant or the de-

fendant was borrowing money to buy something at the store. The defendant may have been carrying prescription drugs or aspirin in his pocket. Additionally, although the 2000 block was considered a high drug area, the police had not received any calls that day complaining of drug activity in that location. (N.T. 6, ll. 17-25.) Also, neither the defendant nor the other gentleman were known to the police as criminals or more specifically, as drug dealers. The police had not received any reports that anyone fitting the descriptions of the defendant or the other individual was engaging in drug activity on or about the date or time of the incident in question. Thus, the circumstances at issue provide little support to reasonably conclude a drug transaction had taken place. Accordingly, the stop must be considered unlawful and any evidence seized as a result thereof must be suppressed.

To proceed with a full analysis of the situation surrounding defendant's arrest, we shall assume the defendant was lawfully detained by police. Therefore, we must next consider whether the defendant was indeed "frisked" by the officers. A "frisk" has been described as a "careful exploration of the outer surfaces of a person's clothing," or alternatively, a "pat down" of the person. *Terry,* 392 U.S. at 17, 88 S.Ct. at 1877. Throughout the hearing, Officer Heffner testified that he "patted" the item in the defendants front left pants pocket when he initially approached him. (N.T. 25, ll. 15; 31 ll. 6-9; 33 ll. 7-22; 35 ll. 5-11.) Officer Juba also described his partner's actions as a pat down. (N.T. 7, ll. 9-12; 13, ll. 5-7; 15 ll. 15-17; 16, ll. 1-2; 21 ll. 4-9.) From the officer's own admissions, the defendant's pocket was frisked by Officer Heffner.

Furthermore, it must be determined whether the defendant was lawfully frisked. In order for a frisk to

be lawful, it must be reasonable within the purview of the Fourth Amendment. There is "no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1879, quoting *Camara v. Municipal Court,* 387 U.S. 523, 534-35, 536-37, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967). In justifying the particular invasion, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Id.,* 392 U.S. at 21, 88 S.Ct. at 1880. See also, *Commonwealth v. Pollard,* 450 Pa. 138, 299 A.2d 233 (1973); *Commonwealth v. Espada, supra.* An intrusion is reasonably warranted if the police officer is acting to assure himself "that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Terry,* 392 U.S. at 24, 88 S.Ct. at 1881. See also, *Commonwealth v. Dorsey,* 439 Pa. Super. 494, 654 A.2d 1086 (1995); *Commonwealth v. Hicks, supra.* Thus, in the absence of probable cause, the sole justification for a frisk is the protection of the police officer and others nearby. Accordingly, the frisk must be confined in scope to reasonably discover "guns, knives, clubs, or other hidden instruments for the assault of the police officer. *Terry,* 392 U.S. at 29, 88 S.Ct. at 1884. In summary, the U.S. Supreme Court has held "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he

identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Terry,* 392 U.S. at 32-33, 88 S.Ct. at 1884-85.

In the present case before the court, the officers clearly were not conducting a search to discover weapons. At the hearing, Officer Juba testified to the following:

"MR. MULLER: Did you—you described what you thought was in the vehicle—I am sorry in the pocket as being a pill bottle?

"OFFICER JUBA: Yes.

"MR. MULLER: So you didn't think it was a weapon?

"OFFICER JUBA: No." (N.T. 13, ll. 8-12.) Officer Heffner reiterated his partner's thoughts when he also stated he believed the item to be "a pill bottle, a container, a plastic container." (N.T. 25, ll. 16.) During cross-examination, Officer Heffner responded in the following manner:

"MR. MULLER: So it was your intent to find out what was in his [the defendant's] pocket?

"OFFICER HEFFNER: It was my hope that I would find out what was in his pocket. At that time it's a *Terry* stop, I cannot go into his pockets. So the fact that he brought it out for me was his decision, not mine.

"MR. MULLER: Well, you didn't think it was a weapon, right?

"OFFICER HEFFNER: No." (N.T. 36, ll. 12-19.)

The testimony produced by the officers indicates that they cannot point to facts which reasonably warrant the intrusion experienced by the defendant. As previously discussed, absent probable cause, the officers must be acting to assure themselves that the person with whom they are dealing is not armed and dangerous. In the case at hand, the officers explicitly stated they did not believe the defendant was carrying a weapon. Thus, they did not fear for their safety. On the contrary, the officers believed the defendant was carrying narcotics in his pocket. The courts of the United States and this Commonwealth have made it clear that frisks are to be limited to the discovery of instruments used to assault those conducting the frisk and others nearby. A search strictly for narcotics and drug paraphernalia is therefore, unlawful. Any evidence obtained as a result thereof shall be suppressed.[1]

---

1. The Commonwealth has attempted to argue that police were justified in frisking the defendant since they had reason to believe he was a drug dealer. In *Commonwealth v. Patterson,* 405 Pa. Super. 17, 591 A.2d 1075 (1991), the Superior Court took judicial notice that drug dealers are likely to be armed and dangerous. In this case, the court held that, even though the officers had no information the defendant was armed or had a history of violence, the officers acted reasonably "when conducting a protective patdown search for weapons in light of the fact that they had a reasonable suspicion that [the defendant] was presently engaged in narcotics distribution." *Id.* at 23, 591 A.2d at 1079.

However, contrary to the facts in *Patterson,* the police in the instant case were not conducting a protective patdown search for weapons. The officers testified that they did not believe the defendant had a weapon in his pocket. In fact, they believed the bulge to

As a final matter, it must be decided whether the pill bottle can be considered abandoned property and as such, used for evidentiary purposes by the police. The Supreme Court of Pennsylvania addressed this issue in the case of *Commonwealth v. Pollard, supra.* The defendant was a passenger in a vehicle stopped by police after the vehicle proceeded through a red light. While one officer conversed with the driver of the vehicle, the other officer approached the passenger's side of the vehicle. He ordered the defendant, the front seated passenger, and the back seated passenger out of the vehicle. As the defendant alighted, a white packet dropped from his hand. Upon retrieving and opening the packet, the officer placed the defendant under arrest for possession of narcotics. *Id.* at 140-41, 299 A.2d at 234. The court held that normally abandoned property may be obtained and used as evidence, however, "such property may not be utilized where the abandonment is coerced by unlawful police action." *Id.* at 143, 299 A.2d at 236. In arriving at its holding, the court found the initial detainment of the defendant was unlawful as the police did not have a reasonable suspicion that criminal activity was afoot. Since the officer's unlawful and coercive action was the causative factor which motivated the defendant's abandonment, the court ruled the evidence should have been suppressed. *Id.* See also, *Commonwealth v. Jeffries,* 454 Pa. 320, 311 A.2d 914 (1973).

As previously indicated, we have found the police unlawfully detained the defendant since they did not have reasonable suspicion to stop him. While the defendant was detained, the police touched his pocket

---

be a pill bottle. Also, the Harrisburg police, unlike the officers in *Patterson* did not have a reasonable suspicion the defendant was engaged in narcotics distribution.

and asked him to identify its contents. The defendant responded by striking the officer and discarding the bottle. (N.T. 25, ll. 20-25; 26, ll. 1-14.) Such abandonment cannot hardly be considered voluntary. Due to the illegal "stop and frisk," and the coercive actions of police, the bottle must be suppressed.

In conclusion, the actions of the Harrisburg Police denied the defendant his right to be free from unreasonable searches and seizures as guaranteed by the United States and Pennsylvania Constitutions. Accordingly, the bag of marijuana, $24 cash and pill bottle shall be suppressed as evidence since they were illegally obtained.

This order and opinion shall not affect any charge filed accusing the defendant of allegedly striking a police officer.

## ORDER

And now, April 4, 1996, after a hearing on the matter, in accordance with the attached opinion, it is hereby ordered that defendant's motion to suppress evidence is granted.