J-S60029-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| ISAIAH TUCKER | |
| Appellee | No. 158 EDA 2015 |

Appeal from the Order December 11, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0007736-2014

BEFORE:  BENDER, P.J.E., LAZARUS, J., and OTT, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED NOVEMBER 30, 2015**

The Commonwealth of Pennsylvania appeals from the order, entered in the Court of Common Pleas of Philadelphia County, that granted Isaiah Tucker's motion to suppress evidence.  Upon careful review, we affirm.

The Honorable William J. Mazzola set forth the facts of this case as follows:

> [O]n the date in question, at about 10:30 p.m., [Officer Anzideo] and [Officer Parker] were in full uniform in a marked car in the area of the 1800 block of South 27th Street, "or in that general direction," responding to a radio call of reported gunshots at 27th and Snyder, which they received when they were on Moore Street approaching 27th.  They turned left and proceeded southbound on 27th, where they, apparently immediately, observed [Tucker] riding a bicycle northbound coming toward them on the passenger side from the area of the shooting which was two blocks further ahead.  He was riding slow, cut across the front of their car and had his left hand, which side of him was facing them, on the handlebar and his right hand "down towards his side.  It wasn't, like, moving.  It was just kind of, like, staying there stationary tucked to the side."  They stopped

the car and got out, [Officer Anzideo] got right in front of [Tucker's] bike and asked what his name was and [Officer Parker] got behind his bike, at which point [Tucker] "just became real, like hyper and saying, 'I'll give you my ID, don't touch me. I don't want you touching me. I'll give you my ID.' and [Tucker] started reaching for his pocket." [Officer Parker] "started conducing a frisk where he was going to reach," immediately felt a gun, screamed "Gun," and [Tucker] jumped off the bike, and then started "to wrestle a little bit for [Officer Parker] to—place [Tucker] in custody." When asked why they approached [Tucker] in the way that they did, [Officer Anzideo] replied "[t]here was a . . . report of a shooting moments prior to that, and we were heading right to that. [Tucker] was coming from that direction. We had a feeling that he could've been involved in the shooting" and "[t]here was nobody else on the street." [Officer Parker] stated that no other information about the shooting had been sent in the radio call, and when asked what he meant when he said [Tucker] was acting hyper said "[h]e was just reiterating that he didn't want to be touched and that he was going to get the ID, like, real loud . . . constantly repeating himself." And when asked "Did he appear to be panicky?" said "Slightly nervous in that way." When asked if he would classify the 1800 block of South 27th Street as a high-crime area, [he] stated "Yes. It's between the Wilson Park Projects and a known – 27th and Tasker, which is a known street corner for high gun violence. They're literally a block apart." He stated that he did not know [Tucker] before that date and that they recovered a gun from him which he then identified.

Trial Court Opinion, 3/23/15, at 2-3 (citations omitted).

Tucker was arrested on June 18, 2014 and charged with receiving stolen property,[1] possession of a firearm while prohibited,[2] without a license,[3] and in public,[4] and resisting arrest.[5] Tucker subsequently filed a

---

[1] 18 Pa.C.S. § 3925(a).

[2] 18 Pa.C.S. § 6105(a)(1).

[3] 18 Pa.C.S. § 6106(a)(1).
*(Footnote Continued Next Page)*

motion to suppress the physical evidence obtained by Officers Anzideo and Parker on July 29, 2014. The court granted Tucker's motion on December 11, 2014.

This timely appeal followed, in which the Commonwealth presents a single issue for our determination:

> Where an experienced police officer responding to a radio call of shots fired saw defendant riding his bike away from the location of the shooting less than two blocks from it, in a high crime area; defendant, who had his right hand tucked at his side, rode his bike across the street in front of the officer's marked car, turning his right side away from the police car; and defendant became "hyper" and reached for his pocket when the police asked for his name, did the lower court err in finding that the police lacked reasonable suspicion to stop and frisk him?

Commonwealth's Brief, at 4.

When the Commonwealth appeals from a suppression order, our responsibility is as follows: "we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted." *Commonwealth v. Dales*, 820 A.2d 807, 812 (Pa. Super. 2003) (quoting *Commonwealth v. Nester*, 709 A.2d 879, 880–81 (Pa. 1998)). "We are bound by the lower court's findings of fact if they are supported in the record, but we must examine any legal conclusions

*(Footnote Continued)* ——————————

[4] 18 Pa.C.S. § 6108.

[5] 18 Pa.C.S. § 5104.

drawn from those facts." *Id.* (quoting *Commonwealth v. Pickron*, 634 A.2d 1093, 1096 (Pa. 1993)). We may reverse a suppression ruling only if the legal conclusions drawn from the facts are in error. *Commonwealth v. Fulton*, 921 A.2d 1239, 1243 (Pa. Super. 2007).

As a threshold matter, we must examine further the Commonwealth's contention that the arresting officer's initial interaction with Tucker was a "mere encounter" and not, as the lower court concluded, a detention.

The Supreme Court of Pennsylvania has identified three distinct categories of interactions between citizens and the police. *Commonwealth v. Ellis*, 662 A.2d 1043, 1047 (Pa. 1995).

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Id.* (internal citations omitted). The line between a "mere encounter" and an "investigative detention" is "not subject to a precise definition" and thus "[e]ach factual situation must be examined to determine if force was used to restrain the citizen in some way." *Commonwealth v. Jones*, 378 A.2d 835, 839 (Pa. 1977).

> If a citizen approached by a police officer is ordered to stop or is physically restrained, obviously a "stop" occurs. Equally obvious is a situation where a police officer approaches a citizen and addresses questions to him, the citizen attempts to leave, and

the officer orders him to remain or physically restrains him; here too a "stop" occurs. A more difficult situation arises where no order or physical restraint is involved and the citizen does not attempt to walk away. This situation is more difficult because a police officer in uniform must be considered as showing authority and thus exercising some force simply because he is in uniform, a symbol of authority, when he approaches a citizen and addresses questions to him.

. . .

Thus, to determine when a "stop" has occurred in the more difficult situation all of the circumstances which may in any way evidence a show of authority or exercise of force including such subtle factors as the demeanor of the police officer, the location of the confrontation, the manner of expression used by the officer in addressing the citizen, and the content of the interrogatories or statements must be examined. Once this factual examination has been made, the pivotal inquiry is whether, considering all of the facts and circumstances evidencing an exercise of force, "a reasonable man, innocent of any crime, would have thought [he was being restrained] had he been in the defendant's shoes."

*Id.* at 839-40.

Here, the trial court concluded that the officer's interaction with Tucker was best characterized as an "investigative detention" as opposed to a "mere encounter." Although the officers gave no verbal order to "stop," the exercise of force upon Tucker was clearly established when one uniformed officer stopped his bicycle by standing in its path, while a second uniformed officer took a position behind the bicycle after it stopped. *See Jones*, 378 A.2d at 839. Based on our review of the record, we find that this legal conclusion was not drawn in error. *Fulton*, 921 A.2d at 1243.

Having agreed with the trial court's determination that Tucker's initial interaction with the arresting officers was an investigative detention, and not

- 5 -

a mere encounter, we next consider whether the seizure was warranted under the circumstances. Both Article I, Section 8, of the Pennsylvania Constitution[6] and the Fourth Amendment of the United States Constitution[7] protect citizens from unwarranted seizures by law enforcement officials. Pennsylvania courts "have recognized only two instances where police may 'seize' an individual[;] both require an appropriate showing of antecedent justification: first, an arrest based upon probable cause; second, a 'stop and frisk' based upon reasonable suspicion that criminality was afoot." *Commonwealth v. Melendez*, 676 A.2d 226, 228 (Pa. 1996) (internal citations omitted).

---

[6] Article I, Section 8, of the Pennsylvania Constitution states:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

[7] The 4th Amendment of the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

A brief detention of a citizen for investigatory purposes, commonly referred to as a "*Terry* stop,"[8] may be found reasonable where the police officer points to specific and articulable facts, "which in conjunction with rational inferences deriving therefrom" warrant the initial stop. ***Commonwealth v. Arch***, 654 A.2d 1141, 1143 (Pa. Super. 1995) (quoting ***Commonwealth v. Prengle***, 437 A.2d 992, 994 (Pa. Super. 1981)). "This standard may be met if the police officer observes unusual and suspicious conduct on the part of the individual seized which leads him reasonably to conclude that criminal activity may be afoot." ***Arch***, 654 A.2d at 1144 (internal citations omitted). "Conversely, an officer's observations of irregular behavior without a concurrent belief that crime is afoot also renders a stop unreasonable." ***Commonwealth v. Espada***, 528 A.2d 968, 970 (Pa. Super. 1987).

A police officer "need not personally observe the suspicious conduct . . . and may rely upon information received over the police radio to justify the initial stop." ***Arch,*** 654 A.2d at 1144. When the suspicious conduct has not been personally observed, the specificity of the description of the suspect is viewed as a major factor in justifying the ***Terry*** stop. ***Id.***; ***see also Commonwealth v. Jackson***, 519 A.2d 427, 431 (Pa. Super. 1986) (finding "vague description" of perpetrator insufficient, in itself, to justify stop and

---

[8] ***See generally Terry v. Ohio***, 392 U.S. 1 (1968).

frisk). However, the officer's conclusion cannot be based upon an "unparticularized suspicion" or "hunch." **Arch**, 654 A.2d at 1144 (quoting **Terry**, 392 U.S. at 27).

Here, Officers Anzideo and Parker initiated an investigative detention based upon their observation of Tucker slowly riding a bicycle with "his left hand on the handlebar, and his right hand [down] towards his side." N.T. Suppression Hearing, 12/11/14, at 7-8. As the officers approached the bicycle, Tucker apparently moved to pass the oncoming vehicle on the driver's side. **Id.** Officer Anzideo testified that "[t]here was a shooting, a report of a shooting moments prior to that, and we were heading right to that. He was coming from that direction. **We had a feeling that he could've been involved in the shooting**." **Id.** at 9-10 (emphasis added).

On appeal, the Commonwealth argues that the totality of the circumstances was sufficient to show reasonable suspicion. **See** Brief of Appellant, at 10. In particular, the Commonwealth notes that the officers stopped Tucker "at night in a high crime area, less than two blocks from where shots fired had just been reported." **Id.** In support of this argument, the Commonwealth highlights two decisions, **Commonwealth v. Zhahir**, 751 A.2d 1153, 1156 (Pa. 2000), and **Commonwealth v. Hughes**, 908 A.2d 924, 927 (Pa. Super. 2006).

In **Hughes**, the defendant challenged his conviction for driving under the influence, claiming that his arrest was illegal. **Hughes**, 908 A.2d at 927. The arresting Pennsylvania State Trooper initially stopped the defendant

after following his vehicle for less than a mile and observing the vehicle swerving across the divided line at least twice. *Id.* Based on his nine years of experience with the Pennsylvania State Police, the trooper testified that "[s]werving in and out of a lane of traffic was a violation indicative of a DUI offense." *Id.* at 928. Based on the totality of the circumstances, this Court found that the defendant's traffic violations provided an "adequate basis for reasonable suspicion justifying the initial traffic stop" and affirmed the judgment of sentence. *Id.* at 928-29.

In *Zhahir*, the Supreme Court of Pennsylvania adopted the plain feel doctrine and held that the seizure of crack cocaine from the defendant's jacket pocket occurred during the course of a lawful weapons frisk following an investigatory detention. *Zhahir*, 751 A.2d at 1163. The origin and basis for the investigatory detention was a tip provided by the officers' captain that "a male, wearing a green jacket and blue jeans, was selling narcotics at 60th and Lansdowne Avenue in Philadelphia." *Id.* at 1155. Acting on this tip, the officers confirmed the location and description of the defendant. Upon seeing the officers, the defendant entered a Chinese restaurant and "appeared to throw something on the floor with his left hand." *Id.* After driving past the restaurant, the officers turned their vehicle around and observed the defendant "exiting the restaurant and looking both ways. When the officers pulled in front of the restaurant, [defendant] had his back to them and was bending over to retrieve something from the floor in the same area where previously he appeared to have discarded an item." *Id.* at

1156. At that point, one of the officers got out of the vehicle and approached the defendant. *Id.*

In considering whether the stop and frisk were warranted, the Court evaluated the totality of the circumstances. The Court reasoned that:

> Such suspicious conduct in an area associated with criminal activity provided independent corroboration of the essential allegation of the information and, thus, suggested that criminality may have been afoot. Of additional consequence, [the officer] was confronted with an individual whose actions appeared to be consistent with retrieval of a weapon from his pocket. In light of the totality of this information, the officers were justified in conducting an investigative detention.

*Id.* at 553-54. In light of this finding, the Court reviewed the officer's decision to frisk and seize the contraband before affirming the defendant's conviction. *Id.* at 555.

In **Hughes**, the totality of the circumstances analysis was informed by the trooper's observation of repeated traffic violations. In **Zhahir**, the Court's decision was supported by the visual corroboration of reported drug activity and a series of suspicious activities observed by the officers prior to initiating the investigative detention. In this case, however, no such opportunity for corroboration or observation existed. Instead, the officers responded to a reported shooting with no suspect description. The officers immediately stopped Tucker based on nothing more than the fact that he changed his path to pass the officers' car on the driver's side rather than the passenger's side. When asked why he and his partner initially approached Tucker, Officer Anzideo acknowledged the report of a shooting and a

- 10 -

"**feeling** that [Tucker] could've been involved in the shooting." N.T. Suppression Hearing, 12/11/14, at 9-10 (emphasis added). This "unparticularized suspicion" or "hunch" is insufficient to show reasonable suspicion. *Arch*, 654 A.2d at 1144 (quoting *Terry*, 392 U.S. at 27).

In sum, Officer Anzideo's rationale for detaining Tucker would apply equally to any person on the street in a high crime area in the wake of a reported shooting. Moreover, Tucker's arguably suspicious activity (i.e. acting "hyper" and reaching for his pocket, ostensibly to produce his "ID") occurred *after* he was detained by the Officers. This activity is irrelevant to the totality of the circumstances analysis because "[s]uch a subsequent observation cannot provide grounds for the antecedent *Terry* stop." *Espada*, 528 A.2d at 971 (citing *Terry*, 392 U.S. at 17).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/30/2015