J-A01040-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RASHID E. VICKS | : | |
| | : | |
| Appellant | : | No. 1262 EDA 2017 |

Appeal from the Judgment of Sentence March 22, 2017
In the Court of Common Pleas of Delaware County
Criminal Division at No(s):  CP-23-CR-0000722-2016

BEFORE:   LAZARUS, J., OTT, J., and PLATT*, J.

MEMORANDUM BY OTT, J.:                    **FILED MARCH 12, 2018**

Rashid E. Vicks appeals from the judgment of sentence imposed on March 22, 2017, in the Court of Common Pleas of Delaware County, following his conviction on charges of possession of a firearm prohibited, firearm not to be carried without a license, and possession of a firearm with an altered manufacturer's number.[1]  He received an aggregate sentence of 48 to 96 months' incarceration, followed by five years of probation.  In this timely appeal, Vicks claims the trial court erred in failing to grant his motion to suppress physical evidence, the gun.  Vicks argues he was subjected to an investigative detention without reasonable suspicion when the arresting police officer called out his name and said hello.  After a thorough review of the

_____

* Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 6105(a)(1), 6106(a)(1), and 6110.2, respectively.

submission by the parties, relevant law, and the certified record, we affirm.

Before we set forth the relevant history of this matter, we restate our well-settled standard of review.

When reviewing a trial court's denial of a suppression motion, our standard of review is as follows:

> our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. [*Commonwealth v.*] *Woodard*, [634 Pa. 162,] 129 A.3d [480,] 498 [(2015)]. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. *Commonwealth v. Galvin*, 603 Pa. 625, 985 A.2d 783, 795 (2009). Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. [*Commonwealth v.*] *Poplawski*, [634 Pa. 517,] 130 A.3d [697,] 711 [(2015)]. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial. *In the Interest of L.J.*, 622 Pa. 126, 79 A.3d 1073, 1085 (2013).

*Commonwealth v. Yandamuri*, --- Pa. ----, 159 A.3d 503, 516 (2017).

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures. *Commonwealth v. Lyles*, 626 Pa. 343, 350, 97 A.3d 298, 302 (2014). Search and seizure jurisprudence defines three levels of interaction between citizens and police officers and requires different levels of justification based upon the nature of the interaction. *Commonwealth v. Tam Thanh Nguyen*, 116 A.3d 657, 664 (Pa. Super. 2015).

> These categories include (1) a mere encounter, (2) an investigative detention, and (3) custodial detentions. The

first of these, a "mere encounter" (or request for information), which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Baldwin*, 147 A.3d 1200, 1202-1203 (Pa. Super. 2016) (citation omitted).

In analyzing whether an interaction has escalated from a mere encounter to an investigative detention, we conduct an objective examination of the totality of the circumstances using the following standard:

The totality-of-the-circumstances test is ultimately centered on whether the suspect has in some way been restrained by physical force or show of coercive authority. [*Commonwealth v.*] *Strickler*, [563 Pa. 47, 757 A.2d 884,] 890 [(2000)]. Under this test, no single factor controls the ultimate conclusion as to whether a seizure occurred—to guide the inquiry, the United States Supreme Court and this Court have employed an objective test entailing a determination of whether a reasonable person would have felt free to leave or otherwise terminate the encounter. *Id.* at 890, n. 8. (citation omitted). "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Michigan v. Chesternut*, 486 U.S. 567, 573-574, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988)(citations omitted).

*Lyles*, 626 Pa. at 350-51, 97 A.3d at 302-303.

Moreover, we emphasize that:

This Court and the United States Supreme Court have repeatedly held a seizure does not occur where officers merely approach a person in public and question the individual or request to see identification. *See Hiibel v. Sixth Judicial District of Nevada*, 542 U.S. 177, 185,

124 S.Ct. 2451, 159 L.Ed.2d 292 (2004) (*quoting INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) (officer free to ask for identification without implicating Fourth Amendment, and requests for identification do not, by themselves, constitute seizures); *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (citation omitted) (even when officers lack suspicion, no Fourth Amendment violation where they merely approach individuals on street to question them or request identification); [*Commonwealth v.*] *Au*, [615 Pa. 330, 42 A.2d 1002,] 1007-09 [(2012)] (citations omitted) (same); *Commonwealth v. Ickes*, 582 Pa. 561, 873 A.2d 698, 701-02 (2005) (citation omitted) (same). Officers may request identification or question an individual "so long as the officers do not convey a message that compliance with their requests is required." *Bostick*, at 437, 111 S.Ct. 2383. Although police may request a person's identification, such individual still maintains " 'the right to ignore the police and go about his business.' " *See In re D.M.*, 556 Pa. 445, 781 A.2d 1161, 1164-65 (2001) (citations omitted) (*quoting Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)).

*Lyles*, 626 Pa. at 351, 97 A.3d at 303.

*Commonwealth v. Singleton*, 169 A.3d 79, 82-83 (Pa. Super. 2017).

With these standards in mind, we turn our attention to the underlying facts of this matter. The trial court specifically found as follows:

On November 19, 2015 at approximately 9:23 A.M. Officer James E. Nolan of the Chester City Police Department was on duty and in the area of 16th Street in Chester, Pennsylvania.

Officer Nolan was in a marked vehicle and in uniform and was conducting an "area check."

Officer Nolan described an area check as follows: "you just drive through the area, and look for any suspicious activity."

Officer Nolan was familiar with the area of East 16th Street and Washington Avenue in Chester, Pennsylvania. He described the

area as a "high-crime area" and explained that he was aware that the area has experienced a rash of robberies and has frequent shootings.

At that time Officer Nolan observed [Vicks] standing on the south side of East 16th Street on the northeastern edge of the Widener campus area.

A review of the testimony of Officer Nolan reveals that he knew [Vicks] from prior encounters with him.

Officer Nolan knew where [Vicks] resided, specifically, that he lived in the Sun Village section of the city of Chester.

Upon recognizing [Vicks], Officer Nolan pulled his patrol car over to where [Vicks] was standing.

He said "hello Mr. Vicks" and started to exit his patrol car.

While he was exiting his patrol car, [Vicks] ran away.

Almost immediately, as [Vicks] was running, he reached for the waist area of his pants. As he did so, he lifted up the bottom of his shirt and exposed the handle of a handgun, which Officer Nolan observed.

Officer Nolan was aware that [Vicks] was a person prohibited from carrying a firearm due to a prior conviction. Accordingly, Officer Nolan gave chase and ultimately apprehended [Vicks].

Findings of Fact and Conclusions of Law, 10/13/2016 at 1-2.

Against these findings, Vicks claims that he was subjected to an investigative detention the moment Officer Nolan called out his name. Specifically, Vicks claims, "[a] reasonable person would believe that he was being restrained or stopped if a uniformed police officer, who had previously stopped the person, approached the person in his vehicle and then called the person by name." Vicks' Brief at 4-5. Vicks cites no case law that directly supports his proposition that a uniformed police officer calling to a person by

name represents the coercive authority or physical force described in *Commonwealth v. Jones*, 378 A.2d 835 (Pa. 1977), that would transform a mere encounter into an investigative detention. Indeed, our review of case law also leads to a similar lack of success. Nonetheless, Vicks cites *Jones*, *supra*, as supportive of his claim. We find that argument unavailing.[2]

In *Jones*, a Missouri state trooper stopped Jones, who was walking along a Missouri highway. Jones looked unkempt but was breaking no law. Nonetheless, the trooper stopped Jones, asked him questions, asked for his identification, and told him to sit in the back seat of his police vehicle while he ran a background check on Jones.[3] Even though the trooper told Jones he could leave while the background check was occurring, our Supreme Court determined while the initial stop of Jones was a close call, by the time the trooper told Jones to sit in the car, he was actively restricting Jones's movements, thereby creating an investigative detention. Because the trooper had no reasonable suspicion that Jones was engaged in criminal activity while walking along the roadway, Jones's subsequent statement to the trooper was suppressed.

---

[2] There is no question that Officer Nolan had a reasonable suspicion of criminal activity when he observed a pistol grip in Vicks' waistband. Officer Nolan knew that Vicks was not allowed to possess a firearm due to a prior conviction. Accordingly, our analysis need focus only on the initial interaction between Officer Nolan and Vicks.

[3] The background check revealed Jones was wanted in Pennsylvania.

Instantly, the trial court determined, and we agree, that Officer Nolan, simply saying hello to Vicks and starting to get out of the car, did not engage in the use of coercive authority, thereby transforming the brief encounter into an investigative detention. In fact, **Jones**, **supra**, relied upon by Vicks, recognizes that any encounter with a uniformed law enforcement officer represents a certain level of exercise of authority by that officer. Such authority is inherent with the police. However, pursuant to **Jones**, it takes more than the routine appearance of a uniformed police officer to represent the type of coercive authority needed to subject a citizen to an investigative detention.

Because there is inherent authority in the presence of a police officer, the totality of the circumstances must be examined to determine whether such coercive authority has been invoked. In **Jones**, stopping a pedestrian, the escalation of questioning, and telling the person to sit in the car, represented coercive authority and an investigative detention. Instantly, the trial court determined as a matter of law, and we agree, that no such factors were present. The trial court concluded: "In the case *sub judice*, Officer Nolan simply pulled his police car up to the curb and said 'hello' to [Vicks]. There was no order to stop and remain. There is nothing in the record about any lights or sirens being activated." Findings of Fact and Conclusions of Law, *supra*, at 2. The certified record is bereft of evidence demonstrating anything other than the presence of a uniformed police officer when Vicks turned and

fled the scene. As such, Vicks' argument that no reasonable person, to whom a police officer has said hello by name, would feel able to leave, fails.[4]

As noted above, once Officer Nolan spotted the pistol grip, he had reasonable suspicion that Vicks was committing a crime. Therefore, the subsequent foot chase, apprehension and arrest of Vicks were all legally justified.

Because Vicks was not subjected to an investigative detention when Officer Nolan greeted him by name, Vicks is not entitled to relief. Accordingly, the trial court properly denied Vicks' motion to suppress.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/12/18

---

[4] We also note there is an internal contradiction in Vicks' argument. He claims that in the situation presented to him, no reasonable person would have felt free to leave, yet that is exactly what he did.