**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 12 WAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered July 17, |
| | : | 2023, at No. 619 WDA 2022, |
| v. | : | affirming the Judgment of Sentence |
| | : | of the Court of Common Pleas of |
| | : | Allegheny County entered January |
| JAMAR FOSTER, | : | 5, 2022, at No. CP-02-CR-0013992- |
| | : | 2019. |
| Appellant | : | |
| | : | ARGUED: April 9, 2025 |

**OPINION**

**JUSTICE DOUGHERTY**                    **DECIDED: MAY 18, 2026**

ShotSpotter is an electronic system, utilized by the City of Pittsburgh, to detect sounds of gunfire and report it to the police. *See Commonwealth v. Weeden*, 304 A.3d 333, 337 n.6 (Pa. 2023). The system's audio sensors detect sounds which may be gunfire. The sounds are then reviewed by experts to determine whether they are gunfire or other similar noises. Their location is triangulated using the coordinates of the sensors in the vicinity. If the noise is determined to be gunfire, the information is sent to the subscribing police department.

In this case, two ShotSpotter alerts indicated five shots had been fired near an address in Pittsburgh in the middle of the night. When a police officer responded to the

location, he encountered appellant and subjected him to an investigative detention.[1] Appellant filed a motion to suppress the evidence subsequently obtained by the police, which was denied. As detailed below, we hold the totality of the circumstances at the time of appellant's investigative detention created reasonable suspicion justifying the stop. Accordingly, we affirm the order of the Superior Court upholding the denial of suppression.

At around 2:00 a.m. on September 17, 2019, Officer Nathan Powers of the Pittsburgh Police Department received a ShotSpotter alert indicating a single gunshot had been fired near 1439 Hoffman Street in Pittsburgh. Multiple police officers responded to the alert. On his way to the address indicated, a second alert came through, notifying Officer Powers of four additional shots at the same location. When he received the second alert, Officer Powers was "only a block or two away" and he arrived at the intersection of Hoffman Street and Chateau Street approximately "10 to 15 seconds" later. N.T. Suppression Hearing, 10/1/20, at 6. While he was still on Chateau Street approaching Hoffman Street, Officer Powers saw a car parked on Hoffman Street with its headlights on. Appellant was in the driver's seat, and a woman, later identified as Tiffany Towns, was in the front passenger seat. Officer Powers turned onto Hoffman Street and activated his emergency lights and dash camera. As the officer drove on Hoffman Street towards the parked car — which was "facing [the officer] parked against the flow of traffic on the right-hand side of the road" — he saw appellant exit the car and walk towards a house. *Id*. at 13. Simultaneously, Towns "looked like she was moving around in the car trying to grab things, . . . like, her purse." *Id*. at 8. Officer Powers stopped his car, got

---

[1] An investigative detention is also known as a "*Terry* stop." *See Terry v. Ohio*, 392 U.S. 1 (1968).

out, and "ordered [appellant] to return to the street so [he] could conduct an investigation." *Id*. at 7. Appellant and Towns were the only people out on the street at the late hour.

Officer Powers, along with the other officers on the scene, repeatedly ordered appellant to return to the street to comply with the investigation, but appellant refused and continued to walk away. The officers "feared that he was armed" due to "the ShotSpotter notification, and [his] walking away." *Id*. at 8. The officers drew their guns, continued to order appellant to comply at gunpoint, and forcibly handcuffed him on the ground.

Appellant was charged with driving under the influence (DUI) highest rate of alcohol, *see* 75 Pa.C.S. §3802(c), DUI general impairment, *see id*. at §3802(a)(1), and driving while operating privilege is suspended or revoked, *see* 75 Pa.C.S. §1543(b)(1.1)(ii).[2] Prior to trial, appellant filed a motion to suppress claiming all evidence obtained subsequent to the seizure of his person should be suppressed as the seizure was not supported by reasonable suspicion. Specifically, appellant claimed "[a] seizure occurred when Officer Powers activated the lights of his police vehicle and ordered [him] to return to the street." Motion to Suppress, 4/9/20, at 3. Appellant argued the officer did not have reasonable suspicion to believe he was involved in criminal activity at the time of the seizure, and any reasonable suspicion formed only after the illegal seizure.

_____

[2] In the criminal complaint, Officer Powers alleged that after seizing appellant, the police located three spent nine-millimeter cartridge casings on the driver side of the vehicle as well as a live round on the ground next to Towns. After observing the rounds near appellant and Towns, officers searched Towns's bag and found a nine-millimeter firearm with one live round in the chamber, which matched the casings next to the vehicle. The firearm had no magazine attached, and a magazine was later located in the center console of the vehicle. An additional spent cartridge casing was found in Towns's purse. After Towns and appellant were separated and read their rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), Towns explained she accidentally discharged her firearm in the vehicle and then, due to a malfunction, accidentally discharged an additional two to three rounds. Officer Powers determined the firearm was registered to Towns, but her permit was revoked. Towns was prosecuted separately and ultimately pleaded guilty to firearms not to be carried without a license under 18 Pa.C.S. §6106(a)(2). *See* Docket CP-02-CR-0014010-2019.

Appellant claimed his unlawful seizure resulted in a violation of his rights pursuant to the Fourth Amendment to the United States Constitution[3] and Article I, Section 8 of the Pennsylvania Constitution.[4]

At the suppression hearing, Officer Powers testified to the above facts. In addition, he explained he had been a police officer for "[a]pproximately five years" and worked in "Zone 1, North Side" at the time of this incident. N.T. Suppression Hearing, 10/1/20, at 4. When specifically asked whether that area was known as a high-crime area, the officer replied: "Manchester has its hot spots, yes." *Id*. at 8. Officer Powers was then asked whether he would "consider this specific section to be a hot spot[,]" to which he replied: "[i]t has been in the past, yes." *Id*. at 9.

On cross-examination the officer was questioned regarding his knowledge of ShotSpotter. He explained ShotSpotter alerts report an address accurately within 80 to 100 feet of the detected noise, and it takes ShotSpotter approximately 30 to 45 seconds from the origination of the sound to determine whether it was a gunshot and deliver the information to the police department. Ultimately, the trial court denied the motion to suppress.

Appellant proceeded to a bench trial. At trial, Officer Powers again testified to the seizure and explained that, after seizing appellant, he noted his eyes were glassy and

---

[3] U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

[4] PA. CONST. art. I, §8 ("The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.").

watery and he smelled of alcohol. The Commonwealth played dash camera footage from the officer's police vehicle.[5] Officer Powers testified he did not find any contraband on appellant's person when he performed a pat down. The officer then investigated appellant's vehicle and found the engine was hot to the touch and the windows had condensation on the inside. Officer Powers explained he concluded the vehicle was recently driven, and based upon appellant's position in the driver's seat, he further investigated for potential DUI. Appellant failed a field sobriety test, and his blood alcohol content was measured at .200. The officer ran appellant's driver's license through a police database, which reported his license was suspended for DUI.[6] Appellant testified in his own defense to explain he did not drive the vehicle, and he was in his mother's home when he heard gunshots and returned outside to the car where his girlfriend was waiting, at which point Officer Powers arrived.

The trial court found appellant guilty of the offenses charged and imposed a maximum sentence of sixty days' incarceration and six months' probation. The Superior Court affirmed appellant's judgment of sentence on appeal. *See Commonwealth v. Foster*, 619 WDA 2022, 2023 WL 4557061 (Pa. Super., July 17, 2023) (unpublished memorandum). Regarding appellant's suppression claim, the panel held appellant was subjected to an investigative detention when Officer Powers exited his police car and ordered appellant to return to the street. *See id*. at *4 ("[T]he parties agree that [a]ppellant was subjected to an investigative detention when Officer Powers exited his police cruiser

---

[5] The dash camera footage, which was not introduced at the suppression hearing, does not depict appellant walking away from the police. However, the officers can be heard ordering appellant to walk towards them multiple times, and the footage shows the officers approaching appellant's general direction with their firearms drawn.

[6] Officer Powers did not testify regarding the firearm, other than mentioning he began investigating for DUI "[o]nce the scene was secured and the firearm situation was separated[.]" N.T. Trial, 7/15/21, at 14.

and ordered [a]ppellant to return to Hoffman Street."); *id*. at *4 n.8 ("We accept the parties' agreement that [a]ppellant was seized when Officer Powers exited his police vehicle and ordered [a]ppellant to return to the street to talk to the officer."). The panel agreed with the Commonwealth that the totality of the circumstances at that juncture supported reasonable suspicion, namely: two ShotSpotter alerts detecting five gunshots; the mere 10-to-15-second delay between the second alert and appellant's presence in a vehicle at the location; appellant and Towns being the only people at the location; appellant "seemingly behaving evasively" in exiting his vehicle and walking away from the officer; Towns "appear[ing] to be grabbing for things in the front-passenger seat"; and "the location in question was a high[-]crime area at 2 a.m." *Id*. at *6, *quoting* Commonwealth's Superior Court Brief at 20-21 (footnote omitted in original). The panel relied on *Commonwealth v. Raglin*, 178 A.3d 868 (Pa. Super. 2018), which found reasonable suspicion where a single shot was reported by ShotSpotter in a high-crime area, Raglin and another man were spatially and temporally close to the report, and Raglin was evasive when an officer arrived. The panel reasoned "[t]he totality of the circumstances in this case were at least equivalent to, if not more significant, than those in *Raglin* in terms of demonstrating reasonable suspicion to validate the investigative detention." *Foster*, 2023 WL 4557061, at *7.[7]

We granted discretionary review to address the following condensed and rephrased issue:

---

[7] The panel noted appellant and Raglin both argued ShotSpotter alerts are akin to or less reliable than an anonymous tip as they lack corroboration and are not sufficient to justify a *Terry* stop. While the *Raglin* panel observed ShotSpotter alerts seem more reliable than anonymous tips, it ultimately declined to rule on the reliability of the technology, instead reasoning the stop "was based on more than just the data obtained from that system." *Foster*, 2023 WL 4557061, at *6, *quoting Raglin*, 178 A.3d at 873. Similarly, here, the panel determined that in light of the totality of the circumstances supporting reasonable suspicion, it "need not decide whether [a]ppellant is correct that a ShotSpotter alert is similar in reliability to an anonymous tip." *Id.* at *7.

> Whether the Superior Court erred in affording too much weight to [appellant's] temporal and spatial proximity to a ShotSpotter alert in assessing whether reasonable suspicion existed to support a *Terry* stop.

*Commonwealth v. Foster*, 316 A.3d 619 (Pa. 2024) (*per curiam*). As this issue requires our review of the suppression court's denial of suppression, our scope of review is limited to the record from the suppression hearing. *See Commonwealth v. Barr*, 266 A.3d 25, 39 (Pa. 2021).[8] "We review trial court suppression orders to determine whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Id.*, *citing Commonwealth v. Yandamuri*, 159 A.3d 503, 516 (Pa. 2017). Where the factual findings are supported by the record, we are bound by them. *See Commonwealth v. Galvin*, 985 A.2d 783, 795 (Pa. 2009). We assess the record in the light most favorable to the prevailing party, which in this case was the Commonwealth. *See Commonwealth v. Mathis*, 173 A.3d 699, 706 (Pa. 2017). "As an appellate court, we are not bound by the suppression court's conclusions of law; rather, when reviewing questions of law, our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Hicks*, 208 A.3d 916, 925 (Pa. 2019), *quoting Commonwealth v. Wilmer*, 194 A.3d 564, 567 (Pa. 2018).

Appellant argues the lower courts weighed his spatial and temporal proximity to the ShotSpotter alerts too heavily when determining whether reasonable suspicion justified his seizure. *See* Appellant's Brief at 25 (claiming this argument has been "glossed over" and not "meaningfully analyze[d]"). He claims the panel below treated the ShotSpotter alerts similarly to eyewitness testimony of a crime taking place with a description of the perpetrator. According to appellant, this analysis ignores his question, which is "whether such evidentiary weight can be applied to ShotSpotter[.]" *Id.* at 26.

---

[8] Consequently, we do not consider the information contained in the criminal complaint or the dash camera footage, since neither was introduced at the suppression hearing. *See supra* notes 2 & 5.

Appellant contends the only facts articulable at the time of his seizure were the ShotSpotter alert and his presence "in a high[-]crime area at night[.]" *Id*. As appellant sees it, the Pennsylvania Constitution should require, similar to an anonymous tip, that a ShotSpotter alert be further corroborated by some indicia of criminal activity by a particular suspect before an individual may be seized.

Appellant rejects the panel's comparison of his case to *Raglin* and seeks to distinguish the two. Particularly, he notes the record in this case reflects: the area where he was seized is a residential neighborhood; ShotSpotter alerts can relay inaccurate addresses; Officer Powers acknowledged the possibility another individual fired a gun "in the general vicinity of the alert"; there was no evidence appellant knew police were approaching; and there was no evidence a crime was being committed — all things contrary to the facts in *Raglin*. *Id*. at 33. Ultimately, appellant argues the Superior Court in both cases assumed ShotSpotter's reliability and equated it to "known eyewitness testimony or to direct observation." *Id*. at 35. He claims that without the alert, there would have been no police response in this case, necessitating an analysis of the alert. On the reliability of ShotSpotter, appellant claims the system is limited by its audio-only nature, as it provides no information related to potential suspects. Appellant would have us treat ShotSpotter as an anonymous tip, which we have determined cannot, on its own, create reasonable suspicion to justify a *Terry* stop.

*Amici curiae* the Pennsylvania Innocence Project and the Pennsylvania Association of Criminal Defense Lawyers (collectively, PAIP), the American Civil Liberties Union and the American Civil Liberties Union of Pennsylvania (collectively, ACLU), and the Allegheny County Public Defender's Office (ACPD) filed briefs in support of appellant, echoing his arguments. *Amici* agree ShotSpotter is a faulty method for detecting gunfire. *See Amicus* PAIP Brief at 14 ("ShotSpotter's use of human reviewers does not obviate

the risk of false positives. Humans may misidentify non-gunfire as gunfire as or more often than ShotSpotter's algorithm[.]"); *Amicus* ACLU Brief at 8-21 (arguing ShotSpotter's methods are faulty, subjective, and produce inconsistent results); *Amicus* ACPD Brief at 18 ("ShotSpotter's 'sensors' are not high-tech directional detectors but microphones 'similar to ones found in cellphones,' meaning that they are as susceptible to error as any cell phone mic.") (citation omitted). More relevantly to the question before us, *amici* echo appellant's call for us to find a ShotSpotter alert brings little value to a reasonable suspicion analysis. *See Amicus* PAIP Brief at 24-25 ("[ShotSpotter alerts] could as easily reflect innocuous, non-criminal activity, like construction or vehicle noise[s], as a gunshot. And they cannot connect specific individuals to a detected noise. As such, they cannot establish reasonable suspicion[.]"); *Amicus* ACLU Brief at 26-29; *Amicus* ACPD Brief at 10-13. Additionally, *amici* are concerned ShotSpotter's placement in communities of color furthers the risk of racial profiling. *See, e.g.*, *Amicus* ACLU Brief at 22 ("Since ShotSpotter microphones are predominately placed in neighborhoods inhabited by people of color, false positive alerts can also exacerbate over-policing of these communities and cause increases in discriminatory stops, frisks, searches, and citations."); *Amicus* ACPD Brief at 30 ("Especially concerning is the overlap of ShotSpotter's sensors with areas that police have claimed are 'high-crime,' given that, according to the Superior Court's reasonable suspicion analysis in this case, the conjunction of a ShotSpotter alert and a 'high-crime area,' absent any other evidence, will suffice to justify a *Terry* stop.").

The Commonwealth, on the other hand, argues appellant wrongly claims his detention was solely based on his close proximity to the ShotSpotter alerts and his presence in a high-crime area at night. The Commonwealth asserts there were "several other factors" which "led the Superior Court to conclude that the totality of the circumstances justified a *Terry* stop." Commonwealth's Brief at 12. Those additional

factors included appellant's decision to walk away from Officer Powers despite his arrival in a police vehicle with lights activated, Towns's movements as she appeared to grab items in the vehicle, and the fact appellant and Towns were the only people present in the area. The Commonwealth notes the Superior Court panel agreed with its description of these factors, in which it described appellant's behavior as "evasive[ ]." *Id*. at 16, *citing Foster*, 2023 WL 4557061, at *6-7. The Commonwealth asserts appellant's argument "that it is improper for a court to hold that an investigative detention is warranted based only on an individual's close proximity in time and space to a ShotSpotter notification occurring at night in an area known for criminal activity" does not consider the facts of this case and the holding of the panel below. *Id*. The Commonwealth goes on to explain it believes the only way for us to find in appellant's favor is to remove the ShotSpotter notification from the list of factors supporting reasonable suspicion.

To the extent appellant challenges ShotSpotter's accuracy, the Commonwealth asserts appellant did not preserve such a challenge. Thus, any challenge to the validity of the technology is waived and, the Commonwealth contends, appellant is "constrained by the record below, which demonstrated that five gunshots were fired in the vicinity of 1439 Hoffman on the date and time in question[.]" *Id*. at 19. The Commonwealth continues to argue a ShotSpotter alert is distinguishable from an anonymous tip, which can be based on lies formed with malicious intent, as there is no human element to the technology. Further, the Commonwealth claims even if ShotSpotter were similar to an anonymous tip, and needed to be corroborated, Officer Powers possessed corroborating information when he seized appellant: "arriving at the scene within seconds of the second ShotSpotter alert [Officer Powers] observed [appellant] chose to walk away from him instead of remaining where he had been and acknowledging the presence of the police. This behavior, which suggested an evasiveness on the part of [appellant], served to

corroborate the ShotSpotter notification[.]" *Id*. at 24. Finally, the Commonwealth argues the totality of the circumstances here weigh greater in favor of reasonable suspicion than those in *Raglin* and suggests we take persuasive value from that decision.

"Both the Fourth Amendment of the United States Constitution and Article I, §8 of the Pennsylvania Constitution protect citizens from unreasonable searches and seizures." *Commonwealth v. Cook*, 735 A.2d 673, 675 (Pa. 1999) (citation omitted). "Not every encounter between a law enforcement officer and a citizen constitutes a seizure warranting constitutional protections." *Commonwealth v. Adams*, 205 A.3d 1195, 1199 (Pa. 2019). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.*, *quoting Florida v. Bostick*, 501 U.S. 429, 434 (1991). There are three types of interactions between the police and private citizens: mere encounter, investigative detention, and arrest. *See Hicks*, 208 A.3d at 927. A mere encounter "does not constitute a seizure . . . and requires no particular suspicion of criminality[.]" *Id.* An investigative detention, on the other hand, "constitutes a seizure of a person, and to be constitutionally valid police must have a reasonable suspicion that criminal activity is afoot." *Adams*, 205 A.3d at 1200 (citation omitted). An arrest is also, of course, a seizure, "and must be supported by probable cause." *Id.* (citation omitted).

While "[n]o bright lines separate these types of encounters," the United States Supreme Court and this Court have endorsed "an objective test by which courts may ascertain whether a seizure has occurred to elevate the interaction beyond a mere encounter." *Id.* (citation omitted). This test considers whether, under the totality of the circumstances, "a reasonable person would have felt free to leave or otherwise terminate the encounter." *Commonwealth v. Lyles*, 97 A.3d 298, 303 (Pa. 2014). A "reasonable person" under this test is one who is "innocent of any crime[.]" *Commonwealth v.*

*Livingstone*, 174 A.3d 609, 621 (Pa. 2017), *quoting Commonwealth v. Jones*, 378 A.2d 835, 840 (Pa. 1977). "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Lyles*, 97 A.3d at 303, *quoting Michigan v. Chesternut*, 486 U.S. 567, 573-74 (1988).

Reasonable suspicion justifying an investigative detention must be "based upon specific and articulable facts . . . that criminality is afoot." *Commonwealth v. Zhahir*, 751 A.2d 1153, 1156 (Pa. 2000), *citing Terry*, 392 U.S. at 21, 30. The police must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). This is not a particularly demanding standard. "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Kansas v. Glover*, 589 U.S. 376, 380 (2020), *quoting Navarette v. California*, 572 U.S. 393, 397 (2014). "The reasonable suspicion inquiry 'falls considerably short' of 51% accuracy[.]" *Id*. at 381, *quoting United States v. Arvizu*, 534 U.S. 266, 274 (2002). The assessment of whether reasonable suspicion exists "requires an evaluation of the totality of the circumstances[.]" *Zhahir*, 751 A.2d at 1156. This totality is based on all facts, and "[e]ven a combination of innocent facts, when taken together, may warrant further investigation by the police officer." *Cook*, 735 A.2d at 676. The investigative detention must be "justified at its inception"; circumstances arising after the suspect was detained cannot retroactively provide a lawful basis for the stop. *Zhahir*, 751 A.2d at 1156, *quoting Terry*, 392 U.S. at 20.

Because an investigative detention must be lawful at its commencement, we begin with consideration of when Officer Powers seized appellant. The suppression record

reflects Officer Powers received an initial ShotSpotter alert of a single shot fired at 1439 Hoffman Street, followed by a second alert of four shots fired at the same location. He drove to this location and observed a parked car with appellant and Towns inside. After observing the car, the officer turned his police cruiser from Chateau Street onto Hoffman Street and activated his lights and dash camera. As he drove on Hoffman Street in the direction of the parked car, Officer Powers saw appellant exit the car and walk towards a private residence while Towns made furtive movements inside the car.[9] The officer stopped his car, exited his vehicle, and ordered appellant to return to the street. At that juncture, when Office Powers ordered appellant back to the street, appellant was subjected to an investigative detention under Article I, Section 8 of the Pennsylvania Constitution. Having been expressly commanded by a police officer to stop walking away and return to the officer, a reasonable person, innocent of any crime, would not have felt free to simply disobey the official order and continue on his way. *See Jones*, 378 A.2d at 839 ("If a citizen approached by a police officer is ordered to stop or is physically restrained, obviously a 'stop' occurs."); *see also Commonwealth v. Jackson*, 302 A.3d 737, 762 n.1 (Pa. 2023) (opinion in support of reversal) (Dougherty, J.) ("Under the Fourth

_____

[9] Justice Donohue insists appellant "had already exited [the car] and begun walking away when the [sic] Officer Powers turned on his emergency lights[.]" Dissenting Opinion at 2 n.2 (Donohue, J.). In support thereof, she notes the officer's testimony that "[w]hen I turned down the street and turned on the lights, he was walking away." N.T. Suppression Hearing, 10/1/20, at 14. However, his testimony at other points in the suppression hearing provided that he activated his overhead lights while appellant was still seated in the car. *See id*. at 7 ("I turned my vehicle down the street to approach the vehicle and intended to talk to the two individuals. I activated my lights and my camera system to **detain the individuals in the car**. I observed a black male **leave the driver's seat** and walk towards a private residence.") (emphasis added); *id*. at 13 ("And I saw the vehicle with its lights on **being occupied**. Then I turn down the street and initiate, turned on my lights.") (emphasis added). Pursuant to the governing standard of review obliging us to assess the record in the light most favorable to the Commonwealth as the prevailing party at the suppression hearing, any conflict in the testimony in this regard must be resolved in the Commonwealth's favor, *i.e.*, appellant did not exit the car until after Officer Powers activated his emergency lights. *See Mathis*, 173 A.3d at 706.

Amendment to the United States Constitution, a police order to stop must actually be obeyed by the person to constitute a seizure. . . . Nevertheless, under our state counterpart to the Fourth Amendment, Article I, Section 8 of the Pennsylvania Constitution, a police order to stop effectuates a seizure.") (citations omitted).[10]

---

[10] In the Superior Court, appellant asserted:

> Arguably, a seizure occurred even before that point [of appellant being ordered back to the street] when Officer Powers rounded the corner of Hoffman Street and activated his lights and sirens. As aptly observed in *Livingstone*, in the realities of everyday life, a police officer's activation of emergency lights and sirens on his police vehicle is a clear signal that he or she is not free to leave a scene.

Appellant's Superior Court Brief at 52-53. We hold this claim is waived for two reasons. First, appellant has abandoned it in his briefing to this Court. *See Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."). Second, appellant did not preserve the issue in the trial court. Again, he alleged in the trial court that "[a] seizure occurred when Officer Powers activated the lights of his police vehicle **and** ordered [him] to return to the street." Motion to Suppress, 4/9/20, at 3 (emphasis added). That is, he did not contend in the trial court, as he did in the Superior Court, that the officer's activation of his emergency lights and siren was alone sufficient to subject appellant to an investigative detention. For this reason too, this claim is waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). Moreover, while it is not necessary to reach the merits of appellant's twice-waived argument, we observe that contrary to his contention, Officer Powers in fact never activated his siren. *See* N.T. Suppression Hearing, 10/1/20, at 12 ("I didn't initiate my siren because it's 2:00 in the morning."). In addition, the facts of *Livingstone* did not simply involve "a police officer's activation of emergency lights[.]" Appellant's Superior Court Brief at 53. Rather, in that case, Livingstone was pulled over on the right shoulder of the road with her car running and no hazard lights activated, when a police officer "activated his emergency lights and, with his passenger window down, pulled **alongside** [her] stopped vehicle." *Livingstone*, 174 A.3d at 614 (emphasis added). This Court "conclude[d] that, because a reasonable person in [Livingstone's] position would not have felt free to leave after [the police officer] pulled his patrol car, with its emergency lights activated, **alongside** her vehicle, [Livingstone] was seized and subjected to an investigative detention." *Id*. at 638 (emphasis added). Here, by contrast, when Officer Powers activated his emergency lights as he turned onto Hoffman Street, he had not pulled up alongside or behind the vehicle. *See* N.T. Suppression Hearing, 10/1/20, at 8 (Officer Powers testifying that as he drove down Hoffman Street towards car
(continued…)

Because the investigative detention occurred when Officer Powers ordered appellant to return to the street, the pertinent reasonable suspicion inquiry is whether the totality of the circumstances at that point in time provided a particularized and objective basis for suspecting appellant of criminal activity.  *See Zhahir*, 751 A.2d at 1156.

As an initial matter, we reject the Commonwealth's argument, credited by the Superior Court, that the purported fact the seizure occurred in a high-crime area supported reasonable suspicion.  The Commonwealth's claim of a "high-crime area" lacks record support.  The entirety of the Commonwealth's proof in this regard was as follows:

> Q.    . . . In your training and experience in this particular area, would it be known as a high-crime area?
>
> A.    Manchester has its hot spots, yes.
>
> Q.    And would you consider this specific section to be a hot spot?
>
> A.    It has been in the past, yes.

N.T. Suppression Hearing, 10/1/20, at 8-9.  This bare testimony claiming the area was a "hot spot" at some undefined time "in the past" does not equate to evidence the area was a high-crime area at the time of the seizure.  *See Commonwealth v. Lewis*, 343 A.3d 1016, 1037 n.14 (Pa. 2025) (explaining the Commonwealth is required to prove an area is high in crime "**at the time of the stop**") (emphasis in original).  Moreover, as we recently held in *Lewis*, conclusory testimony of this sort, which simply characterizes an area in broad generalities or uses magic words without providing any rationale for the characterization, is not sufficient to prove an area is, in fact, high in crime.  *See id*. at 1022 ("merely intoning buzzwords is never sufficient to prove an area is high in crime").  Officer Powers's "vague remark is precisely the type of testimony" courts should be "hesitant to accept."  *Id*. at 1037.  In fact, the testimony is so substantively and temporally vague that

_____

he observed appellant leave car and Towns make furtive movements inside of vehicle). *Livingstone* did not address this situation.

we are compelled to conclude a factual finding of a high-crime area is not "supported by the record." *Id*. Thus, the Superior Court erred by considering this factor in assessing reasonable suspicion, and we decline the Commonwealth's request to consider this factor in our analysis.[11]

Nonetheless, the articulable facts supported by the record are sufficient to sustain a finding of reasonable suspicion at the time Officer Powers ordered appellant to return to the street. Specifically, there were two ShotSpotter alerts, received within moments of each other, indicating five gunshots had been fired near 1439 Hoffman Street. There is no argument the ShotSpotter alerts did not indicate gunfire as reported.[12] The alerts of

---

[11] The concurrence asserts Officer Powers's testimony was "sufficient to establish that the area was a high-crime area" because it was "based on personal knowledge" and was "not based on mere conjecture[.]" Concurring Opinion at 3 (Mundy, J.). Yet the bare fact an officer's testimony may be premised on personal knowledge or experience does not necessarily render it sufficient to establish a high-crime area. In *Lewis*, an officer testified an area was "'very well known for the high-crime rate we've had[,]' but gave no other relevant specifics." *Lewis*, 343 A.3d at 1037 (citation to the suppression hearing omitted). While this testimony was ostensibly premised on the officer's personal knowledge, the *Lewis* Court nonetheless indicated it was too "vague" to be "accept[ed]" as evidence of a high-crime area. *Id*. Presently, Officer Powers's testimony summarily agreeing, in response to a leading question, that the area had been a hot spot in the past was likewise utterly vague and devoid of relevant specifics — not to mention its lack of a temporal nexus to the stop. This is exactly the type of unsubstantiated, amorphous testimony *Lewis* discredits. Further, the concurrence claims appellant conceded the high-crime area factor by reciting the phrase in his briefing to the Superior Court and this Court. *See* Concurring Opinion at 3-4 (Mundy, J.). However, "[a]n admission is not conclusively binding as a judicial admission unless the testimony is clear and unequivocal[.]" *In re Risperdal Litig.*, 223 A.3d 633, 641 n.5 (Pa. 2019), *quoting Greater Valley Terminal Corp. v. Goodman,* 176 A.2d 408, 410 (Pa. 1962). Officer Powers's bare testimony the area was a "hot spot" at some indeterminate point in the past was hardly "clear and unequivocal" evidence the location was a high-crime area at the time of the challenged seizure.

[12] Although it is immaterial to our analysis, and it is demonstrated by evidence beyond the scope of our review, it appears the ShotSpotter system accurately detected gunshots at the reported location in this instance. The allegations in the criminal complaint as well as the footage from Officer Powers's dash camera indicate there was a firearm at the location which was fired at least four times. Moreover, appellant himself testified at trial that he heard the gunshots. *See* N.T. Trial, 7/15/21, at 57.

gunfire were suggestive of criminal activity.[13]  They raised the possibility of violent crime, gun possession crimes, and/or the prohibited discharge of ammunition.  *See* PITTSBURGH, PA., CODE OF ORDINANCES §695.04 (2019) ("No person shall use a weapon to discharge ammunition or arrows in any public place within the City of Pittsburgh, except . . . under appropriate supervision at duly-established target ranges" or "in circumstances permitted by the Crimes Code[.]").[14]

Importantly, appellant and Towns were the **only** individuals present at the precise location of the alerts.[15]  Arriving immediately on the heels of the gunshots, Officer Powers was not confronted with a plethora of potential suspects but only two, one of whom was appellant.  It was reasonable to infer these individuals were potentially responsible for the fired shots.  *See State v. Nimmer*, 975 N.W.2d 598, 600 (Wis. 2022) (finding reasonable suspicion where officer arrived on scene shortly after receiving ShotSpotter alert and defendant was only individual present); 4 WAYNE R. LAFAVE, SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT §9.5(g) n. 368 (6th ed. 2025) ("Association with a place as to which there is reasonable suspicion of [criminal] activity can also contribute

---

[13] Appellant insists we should treat ShotSpotter alerts as akin to anonymous tips.  In our view, appellant's request that we transplant the anonymous tip framework into this context unnecessarily complicates the straightforward legal issue presented: Did the totality of the circumstances at the time Officer Powers subjected appellant to an investigative detention by ordering him back to the street provide reasonable suspicion justifying the seizure?  We answer this straightforward question with a straightforward answer: Yes.

[14] The shots were fired in a residential neighborhood in the middle of the night at 2:00 a.m.  The character of the area and lateness of the hour increased the possibility of street crime as opposed to, for example, lawful target practice at a shooting range during normal daytime hours.  *See Commonwealth v. Cortez*, 491 A.2d 111, 112-13 (Pa. 1985) (fact that stop occurred shortly after midnight supported reasonable suspicion).

[15] Justice Donohue claims "ShotSpotter may be off by over 30 yards when it returns an address."  Dissenting Opinion at 13 (Donohue, J.).  In evaluating reasonable suspicion, "[c]ourts cannot reasonably demand scientific certainty . . . where none exists[.]" *Lewis*, 343 A.3d at 1038, *quoting Glover*, 589 U.S. at 380 (quotation marks and additional citation omitted).

to reasonable suspicion as to the person."). That Officer Powers promptly arrived on the scene within seconds of the second alert supports this inference. His rapid response time left little opportunity for the shooter to hide or flee. The officer's quick arrival increased the likelihood the culprit remained visible at the scene. *See United States v. Jones*, 1 F.4th 50, 53 (D.C. Cir. 2021) (finding reasonable suspicion existed where officers responded within a minute and a half after receiving police call reporting ShotSpotter alert and suspect was only individual present).[16]

Finally, as Officer Powers drove up Hoffman Street with his lights activated, appellant's companion, Towns, made furtive movements in the front seat of the car. "As [appellant] was leaving the vehicle," Officer Powers observed Towns "moving around in the car trying to grab things[.]" N.T. Suppression Hearing, 10/1/20, at 8.[17] Appellant then

---

[16] Justice Donohue argues that since it takes ShotSpotter approximately thirty to forty-five seconds to report a gunshot to the police, "Officer Powers observed [appellant's] vehicle at least forty to sixty seconds after the second round of shots were fired," and "[f]orty to sixty seconds is plenty of time to flee the scene by foot and certainly by vehicle[.]" Dissenting Opinion at 12 (Donohue, J.). Sixty seconds or less is undoubtedly a very prompt response time minimizing the possibility of the culprit's flight. Indeed, this was an even quicker police response than the one in *Jones*. As noted, in that case, the police arrived within a minute and a half **of the police call reporting the ShotSpotter alert**. *See Jones*, 1 F.4th at 54.

[17] Justice Donohue suggests we should not even consider Towns's movements because those "movements would implicate Towns first and foremost, and this case does not concern whether Officer Powers possessed reasonable suspicion to detain her." Dissenting Opinion at 5 (Donohue, J.). On the contrary, the incriminating conduct of a car passenger is unquestionably among the totality of the circumstances which may support reasonable suspicion to stop the driver, as the Supreme Court has recently reaffirmed. *See District of Columbia v. R.W.,* 608 U.S. ___, 146 S. Ct. 1069, 1072 (2026) (*per curiam*) ("The driver, R.W., did not run from the car, but his companions' flight cast his presence in a suspicious light. After all, we have observed that a car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing.") (quotation marks and citations omitted). Justice Donohue additionally contends Officer Powers "did [not] mention [Towns's] behavior as a basis for his suspicion of [appellant]." Dissenting Opinion at 5-6 (Donohue, J.); *see also id*. at 6 ("Nor can we ignore that Officer Powers never articulated that Towns'[s] movements had elevated his suspicion of [appellant].").
(continued…)

began "walk[ing] towards a private residence" and "away from" Officer Powers. *Id*. at 7, 15. These evasive behaviors supported a reasonable belief that criminal activity was afoot. *See In re D.M.*, 781 A.2d 1161, 1164 (Pa. 2001) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion[.]"), *quoting Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).[18]

_____

In fact, Officer Powers testified his "primary concern was the **two** occupants." N.T. Suppression Hearing, 10/1/20, at 17 (emphasis added). Towns clearly did factor in the officer's suspicions. In any case, Officer Powers's subjective thoughts are irrelevant to the test for reasonable suspicion, which is an objective inquiry. *See Wilmer*, 194 A.3d at 571 n.13 ("[T]he reasonableness of the police officer's belief is assessed on an objective, rather than subjective, basis."); *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) ("An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed **objectively**, justify [the] action. . . . The officer's subjective motivation is irrelevant.") (quotation marks and citation omitted, emphasis in original). Finally, Justice Donohue insists "[t]here is nothing suspicious about a woman grabbing for her purse as she prepares to exit a car." Dissenting Opinion at 7 (Donohue, J.). Towns was doing more than grabbing for her purse. She was grabbing for "thing**s**" — plural — and she was "moving around" inside the car. N.T. Suppression Hearing, 10/1/20, at 8 (emphasis added). Moreover, she gave no indication she was preparing to exit the car. Just the opposite: she remained inside the vehicle while appellant got out and began to walk away. Most importantly, Justice Donohue ignores entirely the context in which Towns was rooting around and moving inside the car. Her furtive conduct took place as she was approached by a police cruiser with the overhead light flashing. *See id*. at 7-8. Because Towns's suspicious movements were in direct response to the police presence, they most certainly did "suggest an attempt to hide or obscure evidence." Dissenting Opinion at 6 (Donohue, J.). *See James v. United States*, 829 A.2d 963, 968 (D.C. 2003). ("It is to be expected that persons who are being pursued by police officers will seek to hide contraband such as an illegal weapon.") (quotation marks and citation omitted).

[18] Justice Donohue makes the straw man argument that "[i]t strains credulity to treat [appellant's] behavior as akin to flight, much less [ ] 'headlong' flight[.]" Dissenting Opinion at 8 (Donohue, J.). No one is claiming appellant engaged in "flight" or "headlong flight." We have characterized his conduct as "evasive," which is exactly what it was. *See* https://www.merriam-webster.com/dictionary/evasive (last visited 5/13/26) (defining "evasive" as "tending or intended to evade"). In leaving his car at the sight of the police and seeking to withdraw into a nearby house, appellant was plainly attempting to evade or avoid contact with the police. Certainly, flight and headlong flight are acts of evasions, but they are hardly the only ones. What appellant did here was evasive as well, and as such supported reasonable suspicion. *See D.M.*, 781 A.2d at 1164. Justice Donohue also submits that appellant "was doing precisely what we would expect a driver to do after (continued…)

While none of the aforementioned factors alone may be sufficient to justify reasonable suspicion, here, we hold the totality of the circumstances — the late-night ShotSpotter alerts indicating gunfire in a residential neighborhood, the rapid police response, the sole presence of appellant and Towns at the scene, and the pair's furtive and evasive behaviors upon the arrival of the police — amounted to reasonable suspicion particular to appellant.

Accordingly, we affirm the order of the Superior Court.

Chief Justice Todd and Justices Mundy, Brobson and McCaffery join the opinion.

Justice Mundy files a concurring opinion.

Justice Donohue files a dissenting opinion.

Justice Wecht files a dissenting opinion.

---

he parks his car in front of a residential building at 2 a.m., and there was no evidence tending to show that [he] walked away in response to the arrival of police." Dissenting Opinion at 8-9 (Donohue, J.). Active avoidance is not a typical reaction to the arrival of a police cruiser with overhead lights flashing, as appellant himself elicited on cross-examination. *See* N.T. Suppression Hearing, 10/1/20, at 12 ("Q. That [activation of police lights] usually signifies to people when police are involved that they are to stop and stop moving; correct? A. Correct."). In addition, as discussed, there was testimony appellant exited the car and attempted to retreat to the house while Officer Powers was bearing down on him with his lights activated. *See id*. at 7, 13-14. This evidence squarely supported the conclusion that his evasive conduct was responsive to the police presence.